IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| JODIE and ANDY DRANGE, each individually and on behalf of other persons similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MOUNTAIN WEST FARM BUREAU MUTUAL INSURANCE COMPANY and DOES 1-100,<br><br>Defendants. | CV 20-30-BLG-SPW<br><br>ORDER RE MOTIONS FOR SUMMARY JUDGMENT |

Before the Court is Plaintiffs Jodie and Andy Drange's Motion for Summary Judgment[1] (Doc. 39), filed September 17, 2020, and Defendant Mountain West Farm Bureau's ("Mountain West") Motion for Partial Summary Judgment (Doc. 44), filed September 22, 2020. Mountain West filed a response to Plaintiffs' motion on September 29, 2020. (Doc. 49). Plaintiffs filed a combined reply to Mountain West's response and response to Mountain West's summary judgment motion on October 22, 2020. (Doc. 56). Mountain West filed a reply in support of their motion on November 13, 2020. (Doc. 62). The motions are now deemed fully

---

[1] The Dranges' Motion for Summary Judgment involves arguments for summary judgment on the breach of contract claim (Count III) and violation of Montana's Unfair Trade Practices Act ("UTPA") (Count I). Per Court order, consideration of the Dranges' UTPA argument is stayed pending resolution of motions regarding the breach of contract claim (Count III). (Doc. 66). Therefore, only the Dranges' breach of contract claim is at issue here.

1

briefed and ripe for adjudication. For the following reasons, both motions for summary judgment are denied.

## I. RELEVANT BACKGROUND

Jodie and Andy Drange are homeowners in Laurel, Montana. In 2016, their home was insured by Mountain West Farm Insurance policy CPM03425 ("the Policy"). On May 21, 2016, the residence suffered damage from a hailstorm. Mountain West determined the damage was covered under Dranges' policy.

The policy's loss settlement provisions constitute a two-step process. After the parties agree to the scope and amount of loss, the insurance company will issue a payment to the insureds equal to the value of the estimated damages minus depreciation and deductible. Mountain West determines this amount based on the "going rate" of the services required. (Doc. 15-1 at 29). Insureds have the option to take this initial payment, termed the actual cash value ("ACV") payment, as final payment and settlement of the claim regardless of whether the insureds intend to use the funds to repair the damaged property. However, if the insureds wish to replace or repair the damage, Mountain West will pay the insureds the depreciation amount originally withheld which represents the replacement cost value ("RCV") of the necessary repairs.

Here, the Dranges elected to repair the damage to their residence. In 2018, the Dranges hired Big Sky Contracting ("BSC") to repair their home. The Dranges

2

communicated primarily with Jon Hooley at BSC. Hooley suggested that the Dranges hire Cody Shaver, a public adjuster, to communicate with Mountain West on the Dranges' behalf.

In early June 2018, Shaver submitted a claim to Mountain West on behalf of the Dranges along with BSC's initial bid for repairing the storm damage. Mountain West's Montana District Claims Manager Josh Meyer represented the insurance company and adjusted the Dranges' claim. Meyer, who has reviewed hundreds of claims, personally inspected the Dranges' property twice to review the damage. Meyer also utilized Symbility, a software program commonly used by Mountain West, to calculate rates contractors charge in the area for the repairs the Dranges needed. Meyer and Shaver eventually reached an agreement on the scope of the repairs needed. Meyer estimated Dranges' damages and replacement cost at $44,306.80, with a deductible of $4,300, and a depreciation value of $13,158.92. Based on these estimates, Mountain West paid the Dranges a total of $26,665.71 as their ACV payment.

After the Dranges received Mountain West's ACV estimate, Shaver contacted Meyer to inquire why the estimate did not include an amount for general contractor overhead and profit ("GCOP"), as reflected in BSC's bid. Meyer told Shaver that the ACV estimate represented what he believed was a fair price for the needed services based on both his experience as a claim adjuster and Mountain

3

West's claim adjusting program, Symbility. Meyer did not believe GCOP was reasonably necessary to repair the Dranges' house, however, Meyer requested any documents Shaver might have to support the additional GCOP charges so Meyer could review them, such as subcontractor invoices. Shaver responded that he would inquire with BSC about the subcontractor invoices but ultimately did not send any additional documentation supporting the GCOP estimates.

On January 5, 2019, BSC sent a final invoice to the Dranges for the repairs to their home. BSC's invoice listed the insurance claim portion of the bill as $43,812.83 with an additional GCOP charge of $9,766.93. In total, BSC charged the Dranges $58,601.58. Meyer reviewed this invoice on January 15, 2019 and sent Shaver a reconciliation form that did not include the GCOP charge. Based on this form, Mountain West paid $39,840.80 on the Dranges' claim.

On January 31, 2019, Shaver contacted Meyer to ask about the GCOP discrepancy. Meyer replied on February 8, 2019 and told Shaver that because no documents were received supporting the additional GCOP charge, Mountain West's policy did not cover that additional expense. However, Meyer told Shaver to again send any additional documents supporting the GCOP charge and Meyer would review them.

On February 8, 2019, Shaver inquired again about Mountain West's policy covering GCOP charges. Meyer explained that additional documentation would be

4

needed to support the GCOP charge in this case, such as subcontractor invoices. Meyer never received any additional subcontractor invoices or other documentation supporting BSC's invoice, other than the invoice itself, prior to the Dranges filing their Complaint.

Plaintiffs now move for summary judgment claiming that Mountain West breached their insurance policy by failing to pay the Dranges GCOP.[2] Mountain West argues that it did not breach the insurance contract and moves for summary judgment in its favor on this issue. Mountain West also claims summary judgment is appropriate in its favor due to Plaintiffs failure to comply with the insurance policy's appraisal provision and contractual duty to document losses.

## II. LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit

---

[2] Plaintiffs also argue that Mountain West violated Montana's Unfair Trade Practices Act by misrepresenting relevant coverages and failing to pay GCOP. By prior order of this Court, consideration of this claim is stayed pending this order.

5

under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson,* 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson,* 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.,* 504 F.3d 1017, 1020–21 (9th Cir. 2007).

### III. DISCUSSION

#### a. Breach of Contract

Plaintiffs argue summary judgment in their favor is proper because Mountain West's handling of GCOP payments violates the covenant of good faith and fair dealing implied in every contract. Mont. Code Ann. § 28-1-211 requires parties to a contract to conduct themselves with "honesty in fact and [with] the observance of reasonable commercial standards of fair dealing in the trade." Plaintiffs allege Mountain West refused "to pay GCOP to the Dranges unless they obtained and turned over subcontractor invoices." (Doc. 40 at 10). This practice is not supported by any provision in the insurance contract, according to their argument, or any legal or industry standard. Plaintiffs claim the Policy harms

insureds because GCOP should be paid at the ACV stage, "when GCOP is owed," and Mountain West's refusal to pay GCOP "treats GCOP as something that is owed to the general contractor, when in fact GCOP is owed [to] the insured." (*Id.* at 11).

Mountain West disagrees that summary judgment is appropriate for Plaintiffs but argues the Court should find that the insurance company did not breach any contract provision, real or implied, when Mountain West determined GCOP was not necessary for Plaintiffs' claim. Mountain West asserts the Policy's loss settlement provisions only require the insurance company to pay for the damages "necessarily and actually repaired at the RCV stage." (Doc. 49 at 9). Mountain West's claim adjuster, Meyer, inspected the Dranges' damage and determined that the nature of the repairs would not require the supervision services of a general contractor. Therefore, GCOP was not included in the ACV or the RCV payment. Mountain West asserts this process fully complied with both the insurance contract provisions and industry standards. Mountain West further argues that Meyer provided the Dranges' public adjuster with multiple opportunities to present documentation, such as subcontractor invoices, supporting the need for GCOP, but Plaintiffs failed to produce the invoices. Therefore, GCOP was not necessary and "Mountain West did not breach the contract by declining to

pay GCOP on a project which did not require the employment of subcontractors." (*Id.* at 15).

"The interpretation of an insurance contract is a question of law." *United Nat'l Inc. Co. v. St. Paul Fire & Marine Ins. Co.*, 214 P.3d 1260, 1265 (Mont. 2019). If the contract is clear and explicit, it must be enforced as written. *Id.* Courts analyzing insurance polices must interpret words with their ordinary meaning with any ambiguity strictly construed against the insurer and in favor of coverage. *United States Fire Ins. Co. v. Greater Missoula Family YMCA*, 454 F.Supp.3d 978, 981 (D. Mont. 2020) (citing *Travelers Cas. & Sur. Co. v. Ribi Immunochem Research, Inc.*, 108 P.3d 469, 474 (Mont. 2005)). "Ambiguity exists, when taken as a whole, an insurance contract is reasonably subject to two different interpretations." *Id.*

Several Mountain West policy provisions are relevant here. The Policy states, "[a]ll losses will be settled using the going rate for labor and materials that were in effect at the time of the loss." (Doc. 15-1 at 29). Further, the Policy imposes a duty on the insured to "[p]repare an inventory of all damaged, destroyed, lost, or stolen or other property for which claim is made, including, but not limited to, the following information . . . [b]ills, receipts and related documents that support the claimed loss and the figures in the inventory." (Doc. 15-1 at 30). Mountain West can then ask for insureds to provide those documents "as often as

8

[Mountain West] reasonably require[s]." (*Id.*). Finally, Mountain West "will pay the full cost of repair or replacement of the damaged part without deduction for depreciation," subject to the smaller of three limitations. (*Id.*). The parties do not dispute that the payment limitation at issue in this matter requires Mountain West to pay "[t]he necessary amount actually spent to repair or replace the damage." (*Id.*). However, the Policy also states that an insured "may disregard the replacement cost settlement provisions and make claim under this policy for loss to the damaged building on an actual cash value basis." (*Id.* at 31).

The Court finds that these provisions are unambiguous. Indeed, it does not appear that any party argues that a Policy provision is ambiguous. The arguments center around whether Mountain West's practice in handling the Dranges' claim sufficiently complied with the Policy or if Mountain West went beyond what was required by the insurance provisions. In other words, did Mountain West properly conclude that GCOP was not necessary to repair the Dranges' residence and, if so, did the Dranges provide adequate documentation supporting GCOP?

The Dranges do not dispute that Mountain West uses a combination of software, adjuster experience, and invoices available to establish the "going rate" for particular claims. Mountain West's claim adjuster, Meyer, inspected the damaged property twice, acquired pricing information contractors would typically charge for similar repairs in the local area from Symbility, and reviewed BSC's

9

estimate for how much the contracting service would charge the Dranges for the repairs. BSC's estimate included charges for additional GCOP. Meyer's claim estimate did not include payments for that GCOP because he "saw nothing in the nature, complexity, or circumstances of the repair work which would require the services of a general contractor to supervise subcontractors in making repairs." (Doc. 48-6 at 3, ¶ 10). Thus, the ACV payment to the Dranges did not include any amount for the additional GCOP listed in BSC's estimate.

The Dranges argue this failure to include GCOP breached the Policy and summary judgment is appropriate in their favor. The Court finds that summary judgment is not appropriate given the disputed material facts present. The crux of the argument revolves around whether the "going rate" included charges for GCOP. If it did, then, according to the Dranges, Mountain West would be required to include GCOP amounts in the Dranges' ACV payment. *See, e.g., Mazzocki v. State Farm*, 1 A.D.3d 9, 13 (N.Y. App. 2003); *Ghoman v. New Hampshire Ins. Co.*, 159 F.Supp.2d 928, 934-35 (N.D. Tex. 2001); *Tritschler v. Allstate Ins. Co.*, 144 P.3d 519, 529 (Ariz. App. 2006).[3] Mountain West claims GCOP was not necessary based on Meyer's inspections of the property and the Dranges failed to provide any documents, such as subcontractor invoices, to support a finding

---

[3] Whether GCOP must be included in ACV payments has not yet been resolved by the Montana Supreme Court nor does it appear to have been resolved by the Ninth Circuit Court of Appeals. The term Actual Cash Value is not defined in the Policy. However, the exact sequence of payments is not the dispositive issue in these motions for summary judgment.

10

otherwise. The Dranges claim GCOP was necessary because the contractor hired to do the repairs charged for additional GCOP, as reflected in the initial estimate provided to Mountain West. What was necessary to complete the repairs is clearly a disputed, factual question that would be inappropriate for the Court to resolve on motions for summary judgment. *Reeves,* 530 U.S. at 150 (2000). Therefore, the Court denies both parties' summary judgment motions on this issue.

### b. Appraisal Provision

Mountain West argues that the Dranges' failure to abide by the Policy's appraisal process precludes insurance coverage. The Policy states "[a]ny failure to comply with the terms of this policy shall constitute a material breach of the policy, excusing 'us' from any further performance under the policy." (Doc. 15-1 at 15). The Policy further states, "[i]f 'we' and 'you' do not agree on the value of the property or the amount of the loss, either may make a written demand for appraisal." (*Id.*). The two sides would then select their own appraisers within twenty days of the written notice with a third appraiser to be selected should the first two fail to come to an agreement. (*Id.*).

Mountain West claims Meyers invoked the Policy's appraisal provision via email on July 28, 2018 and named Jamie Fallis as their representative appraiser. Meyers then re-invoked the appraisal process on December 20, 2018 and repeatedly informed the Dranges' public adjuster, Shaver, that any further loss

11

disputes should be handled through the appraisal process. The Dranges did not select an appraiser or otherwise engage in the appraisal process.

The Dranges do not dispute that they did not engage in the appraisal process. The Dranges dispute that Meyer invoked the appraisal process at all and argue that Meyer merely suggested that the parties use the process as a possible route to resolve the GCOP dispute. However, even if Meyer did invoke the appraisal process, the Dranges argue Mountain West waived its right to uphold the appraisal provision by continuing to engage with the Dranges and adjusting their claim. Finally, the Dranges assert that the GCOP dispute was not capable of resolution through appraisal because it involves a question of coverage, not loss.

Meyer stated, via declaration, that he invoked the Policy's appraisal clause on July 23, 2018 and named Jamie Fallis as appraiser. (Doc. 48-6 at 9). On December 20, 2018, Meyer appears to rescind his prior invocation of the appraisal process in an email to Shaver that states:

> I sent the attached July 23, 2018 letter invoking appraisal on the Drange claim.
> In later discussing the matter with Montana DOI, I was encouraged to try to reach some resolution before moving forward with the appraisal.
> Following another inspection of the siding, in an effort to come to agreement on the value of this loss, I revised MWFBI's claim sheet while reserving our right to proceed with appraisal in the future.
> My October 2018 emails explained that the revisions I had made to the claim included adjustments that I find fair and reasonable, and any further disputes would need to be solved through appraisal.

12

> At this time, I refer you back to our selected appraiser, Jamie Fallis, regarding the additional amounts you are requesting beyond what is reflected on my 10/23/18 revised claim sheet.
> Please notify Jamie Fallis of your appraiser.

(Doc. 15-5 at 8). It is unclear if Shaver responded to Meyer's email regarding his referral to the appraisal process.

On January 7, 2019, Shaver emailed Meyer a final invoice he received from the Dranges' contractor seeking final payment for the repairs. (Doc. 15-5 at 7). The final invoice included a line item for GCOP in the amount of $9,766.93. (*Id.* at 6). Meyer responded to Shaver's email on January 15, 2019 with a revised claim sheet "reflecting my release of all estimated depreciation from the amounts that MWFBI had agreed to, as it appears most of the work has been completed." (*Id.* at 7). Meyer stated that the contractor's additional charges are not included in the revised claim sheet and that "any further disputes would need to be resolved through appraisal." (*Id.*).

Shaver emailed back on January 31, 2019 stating, "I am not sure I understand why [the GCOP charges] are simply not being paid without explanation in the correspondence received." (Doc. 15-5 at 5). Shaver goes on to request an explanation from Meyer why Mountain West is not including the GCOP charges in the final bill and what information is needed to release payment for the charges. (*Id.*). On February 8, 2019, Meyer emailed back confirming that GCOP was not included in the revised claim sheet because no documentation had been provided

13

supporting the contractor's charges. (*Id.* at 4). Meyer reiterated, "[a]s I've stated multiple times, disputes about the value of the loss may be handled through the appraisal process." (*Id.*). Shaver emailed back that same day seeking further clarification on the difference between typical contractor overhead and profit and GCOP and how Mountain West handles the two charges. (*Id.* at 2). Meyer responded with an explanation of the charges and informed Shaver that "[m]y claim sheet does not account for any General Contractor Additional Overhead and Profit. If there is documentation supporting why Big Sky proposes to charge General Contractor Additional Overhead and Profit, such as subcontractor invoices, I would be happy to take a look at them." (*Id.* at 1). Shaver sent a final email on February 8 stating, "I will notify the contractor it [sic.] please know that I have been unsuccessful in obtaining them on all prior claims in Montana." (*Id.*). The record is devoid of any further emails or communication between Mountain West and Shaver until the Dranges filed their lawsuit in state court in December 2019.

It is apparent from these emails that questions of fact remain as to whether Meyer properly re-invoked the appraisal clause on December 20, 2018. Meyer informed Shaver that any further disputes would need to be resolved through appraisal and that Shaver should contact Mountain West's appraiser regarding the disputed additional charges. However, Meyer did not tell Shaver that the Dranges

14

must name an appraiser within twenty days of the receipt of that email, as provided in the Policy. Meyer continued to discuss the GCOP dispute with Shaver past the twenty-day appraisal window, including sending a revised claim sheet to Shaver on January 15, 2019 and requesting subcontractor invoices to review on February 8, 2019. While Meyer repeatedly told Shaver that further GCOP disputes should be resolved through appraisal, Meyer did not tell Shaver that the twenty-day window to name an appraiser had closed on January 9, 2019. These discrepancies raise the question of whether Meyer actually intended to invoke the appraisal provision on December 20, 2018. As this question is necessarily factual in nature, it is inappropriate for summary judgment. Therefore, the Court denies Mountain West's motion for summary judgment on this claim.

### c. Failure to Document Loss

Mountain West makes a final argument that the Policy imposed a duty on the Dranges to document their losses and provide those documents to Mountain West upon request. The Dranges, according to the argument, failed to maintain proper documentation to support their claimed loss (namely subcontractor invoices) and failed to send those documents to Mountain West despite numerous requests for those invoices. Because of this failure, Mountain West asserts that they are excused from coverage under the Policy's provisions.

The Dranges did not respond to this argument. However, the Court finds that similar factual discrepancies exist regarding this argument as those described by the Court when considering Mountain West's breach of contract argument. The Policy imposes a duty on insureds to "[p]repare an inventory of all damaged, destroyed, lost, or stolen or other property for which claim is made . . . including, but not limited to . . . [b]ills, receipts and related documents that support the claimed loss and the figures in the inventory." (Doc. 15-1 at 30). An insured must provide those documents to Mountain West "[a]s often as [the insurance company] reasonably require . . . ." (*Id.*).

Here, Mountain West disputed the need for GCOP in repairing the damage to the Dranges' property. Mountain West requested subcontractor invoices or other documents from the Dranges' representative, Shaver, supporting the additional charges. Shaver sent Mountain West the initial estimate from BSC, that included line item charges for GCOP, and the final invoice from BSC, that included line item charges for GCOP. Mountain West apparently did not find these documents adequate to support the stated charges. Email communication between Mountain West and Shaver demonstrate Shaver's confusion about Mountain West's policies and what specific documents were needed to support the additional charges. (See Docs. 15-5 and 48-3). Meyer explained the need for subcontractor invoices to support the charges above what Meyer had originally estimated for the repairs.

16

Shaver responded that he "will notify the contractor it [sic.] please know that I have been unsuccessful in obtaining them on all prior claims in Montana." (Doc. 15-5 at 1). It does not appear that any subcontractor invoices were obtained by Shaver and forwarded to Mountain West before the Dranges filed the present lawsuit.

Therefore, the question becomes whether the Dranges fulfilled their policy duty to document their loss with the "[b]ills, receipts and related documents that support the claimed loss . . . ." (Doc. 15-1 at 30). The question requires a factual finding of what documents the Dranges, and Shaver, had in their possession besides the BSC invoices and what documents the Dranges had access to that were necessary to document the claimed loss. These factual inquiries make summary judgment inappropriate on this claim and is denied.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Defendant Mountain West Farm Bureau Mutual Insurance Company's Motion for Partial Summary Judgment on Count III (Doc. 44) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs Jodie and Andy Drange's Motion for Summary Judgment (Doc. 39) is **DENIED** as to the breach of contract claim (Count III).

DATED this 20th day of May, 2021.

                                                         *Susan P. Watters*
                                                    SUSAN P. WATTERS
                                                   United States District Judge